Next we have Eric C. Rader of the estate of Jermaine Darden versus the city of Fort Worth. Mr. Kita. Good morning, Your Honors. Thank you. May it please the Court. Your Honors, as you're probably aware, this case arises out of the tragic death of a man named Jermaine Darden, a morbidly obese man who was kicked, beaten, punched, and tased by two officers of the Fort Worth Police Department and left to die in handcuffs while he was undergoing a massive heart attack. The District Court concluded that neither the city nor the officers violated his civil rights when doing so because, according to the District Court, the evidence conclusively established that Darden was resisting arrest, that the officers were engaged in regular police activity, and that Darden's death could have resulted from natural causes. Accordingly, the District Court concluded that the officers were entitled to qualified immunity and that the city could not be derivatively liable and that all parties were entitled to summary judgment. This Court should reverse that ruling for three reasons. First and foremost, as discussed at length in our briefing, there is a genuine issue of material fact in dispute as to whether Darden was resisting arrest and the amount of force the officers actually used at the time. Because the Court failed to use the proper standard of review in a summary judgment proceeding, this case should be reversed. Although I'd be happy to answer any questions you have about the evidence in the record that supports this contentious factual dispute, I think the answer in this case ultimately turns on two very important policy questions, assuming you find that a dispute exists. Let me ask a fact question. What's in the record, there's a gap in the tapes. Yes. And the gap deals with or covers the period he was seated on the sofa when the whole thing starts and then he's on the floor. What's the significance of that gap here, and to what extent does testimony fill in the gap? I think the gap is extraordinarily significant, especially because the district court appeared to put all of the weight of its opinion on the idea that the video conclusively established Darden resisting arrest, and it plainly does not. In fact, there are two officers that both had GoPro helmets that ran into the house, and you can see the two videos that are in the record. One of them runs directly by Mr. Darden. You can see that he comes in, he has his hands up, he's attempting to comply. The officer makes the officer with a camera on his head makes no attempt to see what's going on. He runs into a bedroom to search for contraband. The other officer runs right by Mr. Darden, runs into what I guess you could call the dining room, and proceeds to point machine guns at pregnant women and small children and make sure that they stay on the ground. The video also shows, incidentally, that as the officers arrive, they're joking with each other about looking forward to F-ing somebody up and lamenting the nonexistence of fried chicken restaurants in an African-American neighborhood. That's what the video shows. The idea that the video somehow shows Mr. Darden resisting arrest is simply false. There's just no showing of that whatsoever. But there's certain points where he gets up on his knees and gets up. Couldn't that, as a reasonable officer, see as resisting arrest? Because there is some showing that he gets on his hands and gets up and attempts to get up. But what the audio reveals, Your Honor, is at the exact same time that he's making a motion up, which we only see for a fraction of a second when the officer that's in the bedroom sort of pans through the doorway, is you simultaneously hear on the audio track of people saying, he's got asthma, he can't breathe. And a reasonable juror could look at that, hear the audio, and just as reasonably conclude that this person is having an asthmatic seizure as he is attempting to resist arrest. They could also reasonably conclude that if a 350-pound man was attempting to resist arrest against two officers with machine guns, that perhaps the two officers that were standing within 30 feet might have done something about it. Instead, they did nothing about it. They continued to look through doors and closets or to make sure that teenagers were stayed on the ground. There's simply at least, at the very least, a fact issue. And I don't think the facts of this case require this Court to draw some type of bright-line rule that at any time someone gets on their knees, we can per se determine that they're resisting arrest. There's a lot of facts here that simply did not come to light that we believe the district court simply didn't consider. And more to the point. So it seems to me a lot of your case turns on, as you highlighted in your summary just a moment ago, both what they were being told by other people in the room and what they should have known about a person of this size and the danger of him being on his stomach. Maybe other dangers as well. Is that a significant part of your case, the need for the officers to be alert to what other people are saying as well as having some sort of knowledge of the risks involved in dealing with a person of this size? I would say yes on two fronts. First, it's undisputed in the evidence in the record to show that the Fort Worth Police Department issued General Order 314, and that should have been a part of the training for any officer that's a member of that department. And Order 314 specifically deals with positional asphyxia in large obese suspects. And officers should be trained to know that when you're dealing with someone of a certain size, that there are certain complications that can arise. Now, to be clear, I am not arguing that anyone who is obese or anyone who is large somehow is exempt from complying with police demands. That's not the point here. What we have is multiple witnesses yelling, he has asthma, he can't breathe, and the officers plainly ignoring them. To the contrary, he better settle down then, is what they tell him. As opposed to, oh really, he has asthma, we may treat him differently. There's no suggestion that he's reaching for a weapon. There's no suggestion he's trying to escape. There's no suggestion at all. We have three eyewitnesses that say he's not resisting and trying to breathe, and we have the officers that say he's resisting. Again, if he's not resisting. Kennedy. The filming does show he's still near the sofa, which is a convenient place. I mean, hindsight versus the reality of the time, he was still near the sofa. It seems to me a reasonable officer could be concerned if he's not subdued in some way, not moving around, reaching for a weapon in the cushions or under the sofa and that sort of thing. How does that fit into your analysis? If there was evidence that he was reaching for a weapon or trying to reach under the sofa or trying to do anything furtive one way or the other, perhaps we'd have a different case here. We just don't have that evidence. We have evidence from three eyewitnesses who specifically say he was complying with all of their demands, that he wasn't resisting arrest, and that we were informing the officers of his health condition and that the officers ignored all three. Now, again, we don't need a per se rule from this case. What we need is a jury to determine whether these actions were reasonable or not. And that's what the district court unfortunately denied our client. Now, I think another problem that the district court's opinion has is it suggests that even if these actions were unreasonable, as a matter of law, they're entitled to qualified immunity because using a taser is a regular police practice now. And I think that is simply incorrect. I think there's Legion cases, starting specifically with this Court's most recent opinion in, pardon me, Gutierrez v. City of San Antonio, as well as Kitchen v. Dallas County, that suggest that you do not have the opportunity, sorry, a suspect has the opportunity to comply, and a compliant suspect, regardless of whether he's already handcuffed, a compliant suspect is not subject to excessive or should not be subject to excessive force. It's one thing if you have to wrestle someone to the ground or you have to tase them because they're simply not complying. But, again, there's a fact issue here. The eyewitnesses suggest that Mr. Darden was complying, and yet they chose to tase him regardless. And that is the question that ultimately the jury should be responsible to answer is, is this type of force excessive under the circumstances? And in the absence of any conclusive evidence, which the district court found, but with which we disagree, conclusive evidence of resistance or noncompliance, there exists a legitimate question of fact as to whether a taser is an appropriate method of subduing someone. And that's what this Court held recently in the Gutierrez case. And it didn't involve a taser, but it involved the use of a hogtie. And this sort of moves into the second issue I was addressing is, at what point in time is a certain practice clearly established to be deemed excessive force? And this Court looked at the use of a hogtie on a suspect who had been detained for drug use. He was kicking about and flailing in the back of a police car. They thought he was a danger to himself and others, so they tied leg irons around his feet and tied them to his handcuffs behind his back, placed him in the backseat of a car on his stomach. And when they arrived at the police station, he died of positional asphyxia because he couldn't breathe. Kennedy, is that the closest case you have that shows that this was a clearly established constitutional violation? Well, I'd say Gutierrez is probably the most recent, Your Honor. But the important part is it's not the use of the taser. It's not the kicking or the punching, or in Gutierrez, the hogtie. We don't have to go that specific to a level of generality. What we want to look at is, were the officers, would a reasonable officer have known that using this level of violence or, alternatively, positioning someone of this person's size on their stomachs that they can't breathe, is that excessive? And in the Gutierrez case, they said, whether something can be used as a deadly weapon or not can be a question of fact. A hogtie sitting by itself doesn't look like a gun for obvious reasons, but when used improperly can cause a death. And that's the same thing goes with the taser. When someone is having an asthmatic seizure and you fire electric current into their back, the possibility of death is certainly warranted. And this Court noted that in Gutierrez. I think there's one other issue that I'd like to address briefly. I see my time is almost up. The district court also noted that summary judgment was proper because Mr. Darden was an obese man and the death certificate noted that he died of natural causes and therefore suggested that because he was obese and therefore somehow prone to having heart attacks, that the excessive force was not the only cause of his death and therefore summary judgment isn't appropriate. And Gutierrez plainly speaks against that. And if you look at the Court's opinion, it notes that there was a supplemental autopsy done where they said that the positional asphyxia caused by the officer's treatment of him was a contributing cause to his death, in addition to the fact that he was high on numerous narcotics. But the fact that he was a contributing cause to his death and that the police had some involvement with it was sufficient to allow for denial of qualified immunity and for the case to go to the jury. And that's exactly what we have here. We have a case where the officers may have exacerbated a preexisting condition, but they did so. And if deemed to be excessive and unreasonable, they should be liable under 1983. Otherwise, if this Court were to hold otherwise, it would essentially allow officers to have a free shot at any, you know, at any obese person, you know, because at the worst-case scenario, well, they likely would have died anyway, so therefore  You didn't mean a free shot, literally, did you? Well, perhaps poor or good choice of words, regardless. The other reason I wanted to do, the thing I want to address, and I think this is perhaps the most important, with respect to the clearly established law, if this Court suggests that we have to have a virtually identical verbatim case on point in order for the law to be clearly established, it will essentially freeze the development of Section 1983 jurisprudence, because nobody will ever bring suit if they're the first person to have something happen to them. And if nobody ever brings suit, there will never be a subsequent case. And we need Section 1983 jurisprudence to keep things like this from happening at all. I see my time is up, Your Honor. Thank you. Thank you, Mr. Pritzker. Mr. East. Good morning, and may it please the Court. My name's Kenneth East. I have the privilege of representing Fort Worth Police Officer William Snow. Mr. Lee Thomas represents Officer Romero, and Ms. Letitia Coleman-Brown represents the City of Fort Worth. We will all be presenting argument today, so I will get started. The United States Supreme Court in Michigan v. Summers recognized that because the execution of a warrant to search for drugs may give rise to sudden violence or frantic efforts to conceal or destroy evidence, the risk of harm to both police and the occupants is minimized if officers routinely exercise unquestioned command of the situation. In this fairly routine, excessive force, qualified immunity legal analysis, although a terribly tragic outcome because Mr. Darden suffered a heart attack and died at the end of the encounter, Officer Snow was tasked with being the entry man in serving a felony drug warrant into a house containing numerous occupants. He enters, he encounters the primary suspect, a 350-pound individual who Officer Snow had no way of knowing if he was a 350-pound lineman or a 350-pound person with health problems. He sees the guy. Every officer is commanding him to get on the ground. Other officers are taking control of the rest of the scene. Officer Snow commands him to get on the ground. Instead, he reaches over the back of the sofa. Officer Snow grabs his shirt, tries to pull him off. The suspect's resistance is such that the shirt rips off his body. He wrestles him to the ground, eventually with the help of other officers, commanding him to surrender, commanding him to give his hands. He consistently does not. He consistently ignores commands, consistently resists. Contrary to what plaintiffs want the court to believe, the videotape is unrefuted and the witness testimony is unrefuted. Every plaintiff witness, and I recite them in my brief, testifies that, well, he wasn't resisting, he was only struggling against the officer's efforts to control him because they believed he had a breathing problem. But the measure is from the perspective of a reasonable officer in that tense, uncertain, and rapidly evolving situation, what would be reasonable to perceive under those circumstances, and they were encountering a suspect who was resisting. He wasn't getting on the ground. He wasn't staying on the ground. The witnesses did yell out and tell the officer he has asthma, he cannot breathe. Wouldn't that have put the officers on notice that the man might have some breathing issues? Do you just ignore those comments by those people? No, Your Honor. And incidentally, the same witnesses were also yelling at Mr. Darden to stop resisting. But these officers, even if they are hearing that in the din of what's going on in that situation, the law is clear. You don't have to stop what you're doing. You don't have to accept what a suspect says when he's in the process of being handcuffed. They were using reasonable force, reasonable ascending force, two taser deployments after he refused to surrender his hands. If they had known without any question that there were no weapons in the house, that he was nonviolent, he was not a threat, that he was suffering some fatal illness, if they'd known all of that, maybe in hindsight we could say they could have used some different procedure, but that's not what the case they were facing was. They went into a house that even plaintiff's own expert says is one of the most dangerous situations police encounter is a serving felony drug warrant. Well, counsel, you have tried to characterize this case in the briefing, all your defendants counsel have, as a Scott B. Harris sort of situation where video clearly shows what's happened and therefore can't be disputed, genuine disputes, material fact. Seems to me the biggest problem with that argument in this case is the video is not thorough, it does not show the entire scene. And a lot of what's going on of the resisting or not of struggling to breathe is not captured by the video. So what we really are looking at is video that shows some of it. Testimony that you say is in a way consistent in that plaintiff's witnesses are merely saying or acknowledging that he was moving around as the officers were trying to control him. Whatever the reason was would not have been known by the officers. But this does seem a difficult case to resolve on summary judgment without better video evidence. There is nothing beyond what the courts call a metaphysical doubt being raised by plaintiffs because there are some particular gap in time where we don't see 100% what's going on. What we see on the video is what we see on the video. That is undeniable. And what we don't- The gap in between is them getting him to the ground. And there's no allegation below or in this case, that getting him to the ground is the harmful event that we're talking about here. It is the struggle afterwards, the use of the taser is being argued. It's a hodgepodge of things, but there's no doubt among any of the witnesses, police or civilians alike, that Mr. Darden was not complying. And from the very instant you enter, he's not complying. Get on the ground, get on the ground. He reaches behind the sofa. And two things beyond these factual issues that I know, because the outcome was so bad, we want to examine as closely as possible. But the legal issue is qualified immunity. And Officer Snow, whose conduct is to be measured on its own, is entitled to qualified immunity because plaintiffs have not shown he acted unreasonably and have not shown he violated any constitutional right of Mr. Darden's in the face of any clearly established law. And the law is clear that in order to find clearly established law, the plaintiff, and just this year the Supreme Court told us again in White v. Pauley, must identify a case outside the truly obvious case where a suspect's already been handcuffed and he's been hit after he's been handcuffed, not the case here. The plaintiff must identify a case where an officer acting under similar circumstances violated the Fourth Amendment. I know Judge King has written on this in cases recently. Judge Prado. And this plaintiff has never even attempted to identify such a case in the district court, not in this court until its reply brief where they've come up with the idea that because he was so obese, the officer should have been on alert to do something different than they did, use some other type of force perhaps. It's not clear. They cite one Seventh Circuit case and one Alabama district court case. Neither one of those are controlling authority. They don't constitute a robust consensus of persuasive authority, and they're not on point anyway. Is there any testimony in this record about exactly how he got from the seated position to the floor? Because that's where the gap is. Yes, Your Honor. The officers testified they wrestled him to the ground. First, Officer Snow alone. Out of the sofa. Mr. Darden eventually stood up while trying to be pulled by Mr. Officer Snow, then wrestled to the ground. But again, there's no controversy that it took something to get him onto the ground, and there's no allegation that that something is what we're talking about here, that that's a harmful. I'm curious how, because if you look at that video, just exactly how a person of that size is going to get. You ever have a problem getting out of a sofa? How somebody like that size is going to get out of that sofa? So they wrestled him out of the sofa. Yes, I mean, eventually they were wrestling him. He was standing up when they were trying to get him down. They eventually had other officers who wrestled him down. And then the struggle that you see on the video, he's continuing to push up, being told to get down. Even after the right hand is handcuffed, you see him pull his left hand away, put it underneath his body. And that's the only time an officer ever gets on top of him in the video, is to get on top of him and pull that hand out. There are other officers around trying to hold him down, but he is continually pushing up, getting up on his knees. And the burden is on the plaintiff to show what the clearly established law was. But to look at one case, this court's case in Carroll v. Ellington, 2015, a case with much more troubling facts from a use of point of view, but very similar facts from a suspect's reaction to the police point of view. In that case, a completely innocent suspect met the threshold of reasonable detention. The officer engaged him, and he refused commands. He refused to get out of a chair when commanded to get on the ground, and the officer immediately resorted to the taser. And by the time that case was over, he had been struck with weapons, kicks, punches, I believe, and tased over 35 separate taser deployments. He ended up dying. This court said nonlethal force was used throughout. He was not obeying commands. Officers had no way of knowing what threat he was posing when he was resisting. That's a 2015 case where if a reasonable officer looks at that case, in similar law, there's no way an officer's going to come to the conclusion that I can't go into that house and make this man who's refusing my commands get on the ground using the very minimal amount of force in this case. Tragic outcome admitted. The force was reasonable. The law is not clearly established, certainly, that they did anything wrong or that the constitutional question is beyond debate on this one. I don't know what else to say about the tragic aspect of it, but I think the use of force was reasonable. Thank you. Thank you, Mr. East. Mr. Thomas. Ladies and court, I represent Officer Romero. Officer Romero was the driver of the van with the tactical force set to enter the residence of Mr. Darden. He was stationed outside the residence in front of the open front door after it was battered in by the battering ram. For the purpose of apprehending anyone who tried to escape through the front door. From that vantage point, he witnessed the struggle in the living room between Officer Snow and Mr. Darden. And a narcotics officer also witnessed that and came to Romero and told him that he would, in fact, stand in for Romero in guarding the front door if he wanted to go assist with the struggle that was occurring inside the house and was obvious to all who could see. So, by the time Romero gets in the house, Mr. Darden is already on the floor. There's no gap in the video with regard to his activities inside the house. The video clearly shows him entering the front door and assisting Officer Snow with the attempts to handcuff Mr. Darden. There are also two other officers unnamed in this lawsuit who were also trying to assist in this handcuffing. Officer Romero admitted that he indeed did kick Mr. Darden once in an effort to subdue him because he was resisting efforts to place his hands behind his back. The witnesses of plaintiff who were laying face down on the floor, handcuffed, testify that they saw him kick him three times. The autopsy report, which is included in the plaintiff's exhibits, shows that there was a scrape mark to the forehead of Mr. Darden's head, but it was strictly a superficial wound. Therefore, what basically, Officer Romero won are three kicks, whichever. I presume you're going to assume that there were three since that was the testimony. However, there were no damaging kicks. The court in Riggs v. Brewer, this court, in October 28, 2016, at 841 Fed Third 308, discusses a case where there was an erratic motorist confronted with DWI who became involved in a scuffle with a police officer. Punches, numerous punches were delivered to his face, and the court said that non-deadly force may be used to subdue unruly and uncooperating individuals. Is somebody here arguing that your client kicked this man in the head? Yes, I presume that's what they're arguing. Is there any testimony in here about how he got this abrasion on his head? No, and there were three other officers scuffling with him. I mean, if you want to assume facts, you can assume that the abrasion came from the kick, but you have to assume that because there is no direct evidence to that. There is direct evidence that your client kicked the guy when he was down. Yes. He admitted he kicked him one time while he was bending over him. Okay. Thank you. Thank you. Ms. Brown. Good morning. May it please the Court. I represent the city of Fort Worth in this matter. The city of Fort Worth was granted summary judgment in the case dismissed against it based on the derivative issue from the officer's motions for summary judgment, and that the Court determined that because there was no constitutional violation, the city could not be liable. I think that my— Wouldn't that mean that if we uphold the rest of the judgment, we would defer amuse to, but if reverse is against individual offers, we'd have to reverse against Fort Worth because the Court never got to the merits? And that's why I'm standing before you. The city did not only have that issue before the district judge. The city filed its own motion for summary judgment based on no evidence of a policy practice of custom that would have caused a constitutional violation. The trial court did not reach that issue because it determined that, as a threshold matter, there was no constitutional violation. So to the extent that this Court finds that there is evidence of a constitutional violation, that issue as to whether or not the city is still entitled to summary judgment based on its arguments as to policy practice or custom are still outstanding and could be remanded back to the trial court for determination or based on your own determination in judicial economy because it is a no evidence summary judgment motion that the city filed, you could make that determination on your own as to whether or not that the city is still entitled to dismissal of this action. Counsel, do you have a case—my colleagues here probably will be able to answer this from their own recollections, but did you find a case in a situation like this where summary judgment was bonded for one side, was not necessary to get to another summary judgment motion, but on appeal the Court went ahead and addressed an issue, a motion that had not been addressed in the district court? No, sir, I did not. Did you look? Yes, sir, I did. But you did. I just did not find one. There may be one out there, and I missed it, sir, and I apologize if I did. Oh, no. And so I would say that it would probably be a good idea. I guess it's not the right way to say it, but it certainly could be remanded back to the district court for further determination of that issue. How does the general order that the city had cautioning police about how to handle overweight people and that they shouldn't be put on their stomach because they might have a hard time breathing or whatever the ordinance said, what bearing or what effect should that have or does it have on this case? Your Honor, I would submit that the officers acted in accordance with that general order if you look at the video. I would also submit to you that that general order is not specifically toward people who are of that size. It is a general order that deals with people who are in prone positions and that there are studies that show that people, no matter their size being placed in a prone position, has some danger to it. The general order specifies that under circumstances such as that, especially after a struggle, the person should be sat up as soon as possible and monitored. And if you look at the video, you will see that that is exactly what happened in this case. The officer sat Mr. Darden up, and Mr. Darden was at some point positioned with an officer behind him, actually supporting him because he was leaning up against his knee. I would also say to you a couple of things that the record shows. The record shows that at the time that this warrant, this no-knock warrant was initiated, police had MedStar, the city of Fort Worth's ambulance service, stationed near the location in the event that there was a medical need. Police, as soon as they knew that there was a need for medical assistance, asked them to get there. There was some kind of miscommunication. The city doesn't dispute that. It took longer than normal for MedStar to get there. The city officers at the scene made a second call to say, why aren't you here yet? We need help. And so I would say to you that the city of Fort Worth officers acted in accordance with general orders by seeking medical assistance as soon as they knew that medical assistance was needed and that they did sit him up and monitor him as the general orders would say that needed to be done. Was he already dead when they sat him up? Your Honor, I think that the record shows that officers dispute that, that there is some testimony that he was moving, and then at a certain point the officers noted that he did not seek to be responding, and that's when they asked for medical attention to be stat. Mr. Darden had been tased, and because he had been tased, general orders does say that if a person is in a struggle and they've been tased, you can seek for medical attention, but they were seeking medical attention as he became unresponsive. Okay. Thank you, Ms. Brown. Thank you. Mr. Kitta. Thank you, Your Honor. A few points to make. I'd like to start just by responding to the suggestion that somehow we didn't raise the issue of clearly established right until our reply brief. That's false. The case Clark v. Massengale, and Judge Prado, I should have answered your question earlier when you said what's the closest case. Clark v. Massengale is a case from this court in 2016. It involves officers who attempted to use, or did use, an attack dog and a taser in their attempt to arrest a suspect. And there were different versions from different eyewitnesses with respect to who was resisting and what actually happened, and this Court concluded that because of the factual dispute regarding whether or not the suspect was compliant, that genuine issues of material fact precluded summary judgment. In that case, there's also a discussion of whether the right to be free from improper, in that case, use of an attack dog or a taser, was a clearly established right, and obviously it was, because otherwise they wouldn't have remanded. That's a 2016 case from this court. It was cited in our response to the motion for summary judgment. That's page 1454 of the record. And it was addressed in both our opening brief and our response brief, or reply brief. So the suggestion that somehow we waived that argument is simply false. Mr. East noted that there is case law out there that says that you don't have to believe what a suspect says when arresting him. And that's, we don't dispute that. Obviously, anybody who's ever been handcuffed will acknowledge that it hurts. So if there's certainly cases out there that say when a suspect complains that it hurts when he's being handcuffed, the officer does not necessarily need to free him from the handcuffs because of the complaints of pain. What they don't cite, however, in a case I simply cannot find after a thorough and diligent search, is a case that says, as a matter of law, an officer is free to ignore the statements about a party's health condition, that they're completely irrelevant to the analysis. At the very least, it must create a fact issue. And there's simply no case out there that suggests that the officers in this case could have just ignored all the people, either assuming that they're lying or assuming that their own belief in that the suspect followed their instructions somehow trumps all other considerations. Now, they suggest that he was not complying. Their word is not, this is not the Bible here. These are police officers who are supposed to be acting reasonably. They're being informed that somebody has asthma and that somebody's having a seizure, and they're ignoring it, saying, you're not complying with my order, therefore I can do whatever it takes to make you comply. Really? Would the same be the case if they were arresting a child, an elderly person? Could they tase an elderly person if they were simply noncompliant? Or would those officers have to use their brain and make a reasonable guess as to what the likely consequences of their behavior would be? Now, we're not saying that you determine as a matter of law that my client prevails. We're saying that you submit questions of reasonableness to a jury, because that's the role of the jury in the American judicial system. But in a reasonable situation, a reasonable police officer, I mean, you have information that there's a house where drugs are being sold. They know that drug dealers have been known to have weapons. You're going into a house. You don't know who's there, what's there, what's going on. You want to get control of the situation as soon as possible. And people are yelling, and there's all sorts of things going on. Wouldn't it be reasonable just to say just comply and then we'll see, just simply comply and handle it that way? Do you think that was unreasonable on the part of the police to ignore those people that are saying he can't breathe and wanting to get control of the situation as soon as possible for their own safety and the safety of others? Yes, for two reasons, Your Honor. One, and more goes to our claims against the city, which I'll address in a moment. The officers should have been provided with briefing sheets, and that's stated in the record, that would have identified who the likely occupants of the house were going to be, their physical description, whether there was any evidence of weapons in the house before. They were provided with none of this. If the city had provided them with this information, they would have known that, for example ---- They have? Is there any proof that the city had this information? Your Honor, the information in the record that at least four undercover buys were staged at this house. Well, an undercover buy doesn't mean the city's got the information you've described. You're exactly right. And if you look at the testimony from our expert in our summary judgment response, they say that before you do a dynamic forced entry into someone's home, you need to have this information, both for the safety of the officers themselves, but as well as for the safety of the occupants. There were pregnant women and children in this home, and they did a dynamic entry because somebody bought $20 worth of cocaine there. I mean, that's patently unreasonable, or at least shouldn't say patently. That's at least a question that a jury should be considered, whether that was in a reasonable course of conduct. Turning aside from the taser issue, which I know is sort of predominant because it's an obvious connection to the heart attack that he ultimately suffered, I think all three of you noted that Mr. Thomas admitted Mr. Romero kicked him in the face. There's no case law out there that suggests that kicking someone in the face is an appropriate method of subduing someone. At the very least, there's a reasonable question as to whether it was excessive. And at the end of the day, you know, they say, well, the autopsy just shows a mild abrasion and this witness who is lying down couldn't possibly have seen the fact. That's a fact question. That's what juries are for. If they want to believe the medical examiner over Mr. Crippen, that's what their job is. But that's certainly not the district court's job. And the fact is that we have testimony from eyewitnesses who say that he was punched in the mouth and kicked in the face. And they're suggesting that somehow as a matter of law, that is routine police procedure. And that's what the district court said that it was. And we respectfully disagree. And an affirmance of this Court's decision would suggest that it is. If he was kicked in the face, he was already on the ground. Correct. Right? Yes. Well, I mean, again, there is a large gap in the video. We don't know exactly what happened, but I think that's the most likely solution. But again, that's something that a jury should be able to determine. How did this injury happen? You know, if he was already on the ground and he's being kicked in the face, then what was the necessity to tase him? I mean, that is the crux of the case here is we don't know whether he was resisting arrest or whether he was simply having an asthmatic seizure and performing the typical bodily functions that happen when one undergoes that. And again, there's simply no way to decide this case as a matter of law as a result of that giant gap in the video. And for the district court to conclude that somehow as a matter of law he must have been resisting because the officers did so, that's believing their testimony over ours, and the standard of review requires this Court to give our testimony the benefit of the doubt and ignore all contrary inferences. I think the strongest piece of evidence on the defendant's side is that he continued he was not subdued, he did not comply. You have explanations as to why that was. He was having this asthmatic attack, all the other things. But looking at it from the viewpoint of all reasonable officers, not just some, but no reasonable officer must have thought that he was still resisting in order for your defense to be successful in this. What about that? He was continuing to move about. He was certainly not subdued. I don't say he's certain about anything. Apparently he was not subdued. Doesn't that factor in in the qualified immunity analysis? I would think it does factor in, Your Honor, but there's evidence in the record to support what a reasonable officer would have done. We have an expert who has said I have this amount of police procedure experience, this is what we are trained to do, this is what these officers should have been trained to do, and no reasonable officer under these circumstances would have done that. And that's something an expert is qualified to opine about. He certainly can't say as a matter of law this was excessive force, but he can certainly say a reasonable officer in this situation would have done X. And in our case, it was something other than what they did. And that's, again, that's a fact issue. If they want to prop up their own experts and say, no, this was exactly what should have been done, fine, and we'll prop up our own and the jury will decide which one they believe more. But at the end of the day, this is not a summary judgment case. This is a case for a jury to decide. Thank you, Your Honor. Thank you. Thank you all. And the Court will take a short recess before we get to our final hearing.